**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| MELISSA WANNA, on behalf of herself individually and on behalf of a limited class of similarly situated Minnesota residents,<br><br>Plaintiff,<br><br>v.<br><br>RELX Group plc; Reed Elsevier Inc. d/b/a LexisNexis; RELX Inc. d/b/a LexisNexis; LexisNexis Risk Solutions Inc.; and LexisNexis Risk Solutions FL Inc.,<br><br>Defendants. | Case No. 0:26-cv-02556 (JMB/ECW)<br>The Honorable Jeffrey M. Bryan<br>Magistrate Judge Elizabeth Cowan Wright<br><br>**PLAINTIFF'S AMENDED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

## INTRODUCTION

Defendants (together, "Lexis") say the Complaint fails because it rests on "MyLife's conduct, not Lexis's". ECF No. 24 at 6. That is not a defect. It is the architecture of every claim for aiding and abetting and civil conspiracy. Minnesota law holds liable "all who actively participate in any manner in the commission of a tort, or who procure, command, direct, advise, encourage, aid, or abet its commission". *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 185–86 (Minn. 1999) (quotation omitted). A claim of that kind necessarily describes the primary wrongdoer's tort and then the defendant's knowing, substantial contribution to it. The Complaint does both.

MyLife published reputation profiles telling the world that Melissa Wanna had "court records" and that her profile might contain criminal or graphic information. Compl. ¶¶ 12, 21 (ECF No. 1-1). None of it was true. *Id.* ¶¶ 13, 21. The profiles were built "principally" on Lexis's data, and MyLife used them to sell access to the curious, and in this case a dangerous predator, and removal to the subject. *Id.* ¶¶ 1, 12. Lexis knew what MyLife did with its data, the business model was public, and Lexis kept supplying the data, providing customer service and technical support, and renewing the license. *Id.* ¶¶ 13, 22, 33. Without Lexis's data and cooperation, MyLife "could not have published the false reputation profiles". *Id.* ¶ 34.

Lexis's answer is that it merely licensed data in an "arm's length" deal and had a "routine professional relationship" with MyLife. ECF No. 24 at 15–16. The "arm's length" phrase comes from the prior federal action, where Chief Judge Schiltz and the Eighth Circuit decided whether MyLife was Lexis's *agent*; neither decided the § 876 theory pleaded here. MyLife was not Lexis's agent, and Plaintiff does not relitigate the point. The Eighth Circuit noted the theory—liability under Restatement (Second) of Torts § 876—and held it forfeited because it had not been raised in the district court. *Wanna v. RELX Grp., PLC*, 142 F.4th 1102 (8th Cir. 2025) ("*Wanna II*"), slip op. at 4 n.3. Aiding-and-abetting liability does not require agency; it presupposes an independent tortfeasor. And the "routine services" rule Lexis invokes protects professionals rendering ordinary

services, not a vendor that knowingly supplies and supports the raw material of a public-facing wrong. Lexis's aiding-and-abetting authorities were decided after trial, on summary judgment, or on allegations of mere awareness or inaction. Its own authority on substantial assistance, *Weulander*, denied dismissal. The involvement of Lexis is a factual issue to be decided by the trier of fact.

As such, the motion should be denied. If the Court finds any count insufficiently pleaded, dismissal should be without prejudice, and Plaintiff will move to amend under D. Minn. LR 15.1.

## BACKGROUND

Lexis compiles data on individuals and sells it to third parties, including MyLife. Compl. ¶¶ 7, 11. Through a series of data-licensing agreements, Lexis sold Plaintiff's personal information to MyLife. *Id.* ¶ 11. MyLife's profiles "rely on Lexis's data" and are based "principally" on it. *Id.* ¶¶ 1, 12. Plaintiff's profile assigned her a poor reputation score and warned that court records and graphic information existed; MyLife then solicited payment from viewers who wanted details and from Plaintiff to correct or remove the profile. *Id.* ¶¶ 3, 12. Plaintiff has no criminal or court records. *Id.* ¶¶ 13, 21. She was seeking work at the time, and prospective employers who searched her name met the MyLife profile. *Id.* ¶¶ 3, 15, 23.

Lexis knew MyLife used Lexis's data to create such profiles and solicit payments; "[d]espite knowing of MyLife's business model and the harm it caused, Lexis continued to supply data and assistance to MyLife." *Id.* ¶ 13. Lexis knew MyLife "would publish and monetise the profile." *Id.* ¶ 22. MyLife's business model "was publicised", and Lexis—the primary source of the data—"supplied personal data, provided customer service and technical support, and renewed data-licensing agreements with MyLife". *Id.* ¶ 33. Lexis and MyLife "agreed to a common design to monetise personal data by publishing misleading reputation profiles and soliciting payments from consumers", with Lexis supplying the data and technical support and MyLife publishing and collecting. *Id.* ¶ 37. Lexis profited from the arrangement. *Id.* ¶ 14.

Plaintiff first sued Lexis in this Court in 2023 under the Fair Credit Reporting Act, the Driver's Privacy Protection Act, and RICO, with state-law claims. ECF No. 1-2. Chief Judge Schiltz dismissed the federal claims, "mostly because of Wanna's failure to plausibly plead that MyLife acted as Lexis's agent", and declined supplemental jurisdiction over the state-law claims, dismissing them without prejudice. *Wanna v. RELX Grp. PLC*, No. 23-cv-1769 (PJS/JFD), slip op. at 15, 20–21 (D. Minn. Mar. 29, 2024), ECF No. 50 ("*Wanna I*"); *see id.* at 10–19.

The Eighth Circuit affirmed on the agency ground, held the § 876 theory forfeited because it had not been presented to the district court, and affirmed the without-prejudice dismissal of the state claims. *Wanna II*, slip op. at 4 & n.3, 6. No

court has decided whether Lexis is liable under Minnesota law for knowingly and substantially assisting MyLife's torts.

Plaintiff sued in Hennepin County on state-law claims only. Compl. ¶¶ 2, 9. Lexis removed, ECF No. 1, and Plaintiff's motion to remand is pending, ECF No. 14.[1] Lexis moves to dismiss under Rule 12(b)(6). ECF Nos. 19, 24. It relies on the April 8, 2011 Reseller Agreement between LexisNexis Risk Solutions FL Inc. and MyLife, filed publicly in almost entirely redacted form. ECF Nos. 20, 20-1; *see* ECF No. 21 (sealed); ECF No. 24 at 10 n.2.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* The Court accepts the factual allegations as true and draws all reasonable inferences in Plaintiff's favor. *Drobnak v. Andersen Corp.*, 561 F.3d 778, 781 (8th Cir. 2009). And "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is

1 Plaintiff submits this opposition without waiving her position that the Court lacks subject-matter jurisdiction and that the case must be remanded. ECF Nos. 14–17.

plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). Knowledge in particular "may be alleged generally." Fed. R. Civ. P. 9(b). That rule does not give a party "license to evade the less rigid—though still operative—strictures of Rule 8." *Zayed v. Associated Bank, N.A.*, 779 F.3d 727, 733 (8th Cir. 2015) ("*Zayed I*") (quoting *Iqbal*, 556 U.S. at 686–87).

The Court may consider documents "necessarily embraced by the complaint", as well as "matters of public record, orders, [and] items appearing in the record of the case". *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (quotations omitted). Plaintiff does not object to the Court's consideration of the 2011 Agreement. But the Agreement is one.  document in what the Complaint alleges was a "series" of agreements, periodically renewed. Compl. ¶¶ 8, 11, 33. The prior complaint—which Lexis itself placed in this record—identifies nine amendments to the 2011 Agreement between 2013 and 2019. ECF No. 1-2 ¶ 177. None is before the Court. The 2011 Agreement therefore cannot establish the full scope of the relationship, and any inference drawn from its terms runs to Plaintiff.

## ARGUMENT

### I. COUNT III STATES A CLAIM FOR AIDING AND ABETTING MYLIFE'S TORTS.

#### A. Minnesota imposes liability on one who knowingly and substantially assists another's tort, and Count III is pleaded eexactly that way.

Minnesota has "long relied on the 'well recognized' rule 'that all who actively participate in any manner in the commission of a tort, or who procure, command, direct, advise, encourage, aid, or abet its commission, or who ratify it after it is done are jointly and severally liable' for the resulting injury." *Witzman*, 601 N.W.2d at 185–86 (quoting *Greenwood v. Evergreen Mines Co.*, 19 N.W.2d 726, 733 (Minn. 1945)). The Minnesota Supreme Court rejected the proposition that "there is no common law cause of action for 'aiding and abetting'" in Minnesota, *id.* at 185 (quoting *D.W. v. Radisson Plaza Hotel Rochester*, 958 F. Supp. 1368, 1380 (D. Minn. 1997)), and held that, "at least in some circumstances, Minnesota law does recognize a claim based on aiding and abetting the tortious conduct of another." *Id.* at 186. The claim tracks Restatement (Second) of Torts § 876(b), which imposes liability on one who "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself[.]" *Id.* at 185 (quoting Restatement (Second) of Torts § 876(b)).

The claim has three elements: "(1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach." *Id.* at 187.

Lexis agrees that aiding and abetting "is not an independent tort, but a theory of liability under which a party may be held jointly and severally liable

for the underlying tort," and says that "whether labeled an independent claim or a theory of liability propping up her other claims, it fails." ECF No. 24 at 12 (quoting *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 714 (8th Cir. 2019) ("*Zayed II*")); *see Leiendecker v. Asian Women United of Minn.*, 848 N.W.2d 224, 228 n.2 (Minn. 2014) (aiding and abetting and civil conspiracy are each "a theory of liability under which a plaintiff can establish that a defendant is vicariously liable for some tortious act committed by another"). The label, then, is not in dispute; the elements are. Count III identifies the underlying tort—MyLife's publication of false statements about Plaintiff, which "constitutes defamation"—and alleges Lexis's knowing, substantial assistance in it. Compl. ¶¶ 33–35. Count III thus supplies the basis on which Lexis answers for the defamation pleaded in Count I. *See id.* ¶¶ 22, 33. Count IV, the conspiracy count, reaches the consumer-fraud violation as well. *Id.* ¶ 38.

**B. The prior decisions rejected agency, not aiding and abetting.**

Lexis's "arm's length" theme is borrowed from the Eighth Circuit's agency analysis. *Wanna II*, slip op. at 5 ("Lexis and MyLife had no relationship beyond those arm's length transactions."). That analysis asked whether Lexis granted MyLife actual authority, held it out as an agent, or ratified its acts as principal. *Id.* at 4–6; *Wanna I*, slip op. at 10–19. Every one of those questions turns on whether MyLife acted *on Lexis's behalf*. Aiding-and-abetting liability asks something else:

whether Lexis knew MyLife's conduct was tortious and substantially assisted it. *Witzman*, 601 N.W.2d at 187. The doctrine presupposes an independent primary tortfeasor—here, MyLife—and makes the knowing assistant jointly liable for that tortfeasor's tort. A finding that MyLife was not Lexis's agent is consistent with, not contrary to, that theory.

The Eighth Circuit noted the theory, calling it a "vicarious liability theory contained in Section 876 of the Restatement (Second) of Torts", and held it forfeited because it had not been presented to the district court. *Wanna II*, slip op. at 4 n.3. The district court dismissed the state-law claims without prejudice, and the Eighth Circuit affirmed that disposition. *Wanna I*, slip op. at 21; *Wanna II*, slip op. at 6. The theory is presented now, in a complaint that pleads it expressly. Compl. ¶ 32.

Nor does the independent-contractor clause matter. It disclaims an "association, partnership, joint venture, or relationship of principal and agent". *Wanna II*, slip op. at 3. Plaintiff alleges none of those things. Minnesota law is exceedingly clear that parties cannot contract their way out of tort liability to a stranger for knowingly assisting a tort, and a commercial relationship is no defense to that liability: *Witzman* declined to exempt even accountants from aiding-and-abetting liability to nonclients, 601 N.W.2d at 186–87, though it found the pleading before it insufficient, *id.* at 188–89. The relationship between a bank and its customer is ordinarily commercial, yet the Eighth Circuit reversed the

Rule 12 dismissal of an aiding-and-abetting claim against a bank whose employee knew the account holder was not registered with the Secretary of State and authorized a non-signatory's withdrawals. *Zayed I*, 779 F.3d at 733–35.

**C. MyLife committed a tort that injured Plaintiff.**

Lexis's aiding-and-abetting argument challenges only knowledge and substantial assistance. ECF No. 24 at 13–16. Its specificity argument is answered in Part II. MyLife published to the public, including prospective employers, statements that Plaintiff had court records and that her profile might contain criminal or graphic information. Compl. ¶¶ 12, 21, 23. The statements were false. *Id.* ¶¶ 13, 21. ] They harmed Plaintiff's reputation and employment prospects. *Id.* ¶¶ 3, 15, 25. Those are the elements of defamation. *McKee v. Laurion*, 825 N.W.2d 725, 729–30 (Minn. 2013). False accusations of crime are defamatory per se. *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 875 (Minn. 2019) (quoting *Becker v. Alloy Hardfacing & Eng'g Co.*, 401 N.W.2d 655, 661 (Minn. 1987)).

**D. The Complaint plausibly alleges that Lexis knew MyLife's conduct was tortious.**

Minnesota requires actual knowledge. *Zayed II*, 913 F.3d at 715. Knowledge "may be alleged generally", Fed. R. Civ. P. 9(b), and may be shown by circumstantial evidence, so long as that evidence shows the defendant "actually knew of the underlying wrongs committed." *Zayed II*, 913 F.3d at 715 (quoting *Varga v. U.S. Bank Nat'l Ass'n*, 952 F. Supp. 2d 850, 857 (D. Minn. 2013), *aff'd*, 764

F.3d 833 (8th Cir. 2014)). Awareness of "red flags" is not enough; the defendant must be aware "of the wrongfulness of the challenged conduct." *Id.* (quotation omitted). Whether the requisite knowledge is present "depends in part on the particular facts and circumstances of each case", and courts weigh "the relationship between the defendant and the primary tortfeasor, the nature of the primary tortfeasor's activity, the nature of the assistance provided by the defendant, and the defendant's state of mind". *Witzman*, 601 N.W.2d at 188. Knowledge and substantial assistance are evaluated "in tandem." *Id.* (quotation omitted).

Lexis says the Complaint shows at most that Lexis "knew about MyLife's use of the Lexis data in general". ECF No. 24 at 14. That understates the pleading. Lexis "was aware that MyLife used Lexis's data to create such profiles and solicit payments" and continued "[d]espite knowing of MyLife's business model and the harm it caused". Compl. ¶ 13. Lexis "knew that MyLife would publish and monetise the profile." *Id.* ¶ 22. Lexis sold the data "knowing that the data would be used to publish false or misleading profiles and to solicit payment from consumers." *Id.* ¶ 27. Lexis "knew of MyLife's misconduct" and "knew that the arrangement violated consumers' rights". *Id.* ¶¶ 33, 37. Those are allegations of knowledge of the wrong—false profiles used to extract payment—not of the use of data "in general". And they do not stand alone. Each *Witzman* factor supplies circumstantial support.

*The relationship.* A long relationship, standing alone, may support an inference that the defendant knew of a customer's dealings, not that it knew the dealings were wrongful. *Witzman*, 601 N.W.2d at 188. The relationship matters here because of what it was a relationship with. Lexis was MyLife's primary data source, Compl. ¶¶ 12, 33, under a 2011 Agreement that Lexis's own declarant says governs the relationship, ECF No. 20 ¶ 3, and that Lexis renewed, Compl. ¶ 33. Lexis provided MyLife customer service and technical support. *Id.* In *Witzman*, the court could not infer actual knowledge because the trustee's dealings were, with one exception, "not clear violations" of his broad discretion, and a long-time accountant could reasonably have taken them for "legitimate exercises" of it. 601 N.W.2d at 188. MyLife's product carried its wrong on its face: it told the public that Plaintiff had court records and might have criminal or graphic information, and it solicited payment from her to remove that content. Compl. ¶¶ 12, 21; *see id.* ¶ 16. A supplier that services that product's use is plausibly alleged to know not merely what the customer does with its data, but that what the customer does is wrongful.

*The nature of MyLife's activity.* MyLife's business was not a sophisticated fraud hidden in back-office ledgers, as in *Zayed II*. *Cf. Zayed II*, 913 F.3d at 719. It was conducted in public, on the internet. Compl. ¶¶ 3, 12, 23. The business model "was publicised." *Id.* ¶ 33. That allegation has public-record support. In December 2021, a federal court entered a stipulated permanent injunction

barring MyLife from stating, "directly or by implication," that a consumer "may have or does have" or that there are "possible or probable" Covered Records—defined to include sex-offender status, arrest records, and civil and criminal court record information—unless, among other things, MyLife had found such a record about that consumer from a third-party source. Stipulated Order for Permanent Injunction & Equitable Monetary Relief at 4, 11, *United States v. MyLife.com, Inc.*, No. 2:20-cv-06692 (C.D. Cal. Dec. 15, 2021), ECF No. 204 ("*MyLife* Order").[2] The Court may notice the existence and terms of that public order. *Zean*, 858 F.3d at 526. The order is not pleaded in the Complaint, and Plaintiff does not offer it as proof of what Lexis knew. It confirms the plausibility of the pleaded allegation that MyLife's business model was public, Compl. ¶ 33, and it is among the facts the amendment described in Part V would plead.

*The nature of Lexis's assistance and its state of mind.* Lexis's contribution was not incidental. Its data was the substance of the profiles. Compl. ¶¶ 1, 12, 34. It profited from the arrangement. *Id.* ¶ 14. And it continued after it knew. *Id.* ¶ 13. Continuing to perform with knowledge that one's performance is being used to commit a wrong is the paradigm of culpable assistance.

2 The order recites that the defendants "neither admit nor deny any of the allegations in the Complaint, except as specifically stated in their answer to the Complaint." *MyLife* Order at 2. Plaintiff cites it for its existence and public terms, not for the truth of the government's allegations.

Lexis's knowledge authorities do not hold otherwise. In *Lusk v. Life Time Fitness, Inc.*, the aiding-and-abetting defendants were buyers negotiating a merger; the only basis for knowledge was that they knew the target's chief executive was negotiating with them for the company and for his own continued employment, and that they had an opportunity to review the proxy, and the court found that the buyers' three increased bids against a competing bidder "suggest[] an arm's length transaction." 213 F. Supp. 3d 1119, 1136–37 (D. Minn. 2016). Even so, because the plaintiffs "could potentially remedy these defects with additional factual detail regarding knowledge and substantial assistance," the court dismissed "without prejudice." *Id.* at 1137. In *Varga*, the complaint pleaded that the bank knew certain conduct was occurring but was "sorely lacking in facts suggesting the bank had actual knowledge such conduct was wrongful." 952 F. Supp. 2d at 858. Here, the conduct Lexis is alleged to have known about—selling false suggestions of court records back to their subjects—is wrongful on its face. Compl. ¶¶ 12–13, 21–22.

The better analogue is *Weulander v. North Star Credit Union*, which Lexis cites. ECF No. 24 at 13. There, the court denied dismissal of an aiding-and-abetting claim against a credit union that processed 68 transfers for an overseas fraudster, inferring actual knowledge from circumstances "given how highly suspicious it was", and noting that the plaintiff was "unable, absent discovery, to allege more specific facts concerning [the defendant's] knowledge." No. 23-885

(JRT/LIB), slip op. at 13–14 (D. Minn. Feb. 7, 2024), ECF No. 36. *Zayed I* is to the same effect. There the plaintiff "generally allege[d] the knowledge element in multiple paragraphs" and "also allege[d] circumstances strongly indicating knowledge", and the court, reading the complaint "as a whole," held that it stated a plausible claim of actual knowledge. 779 F.3d at 734–35 (quoting *Anderson v. U.S. Bank N.A.*, No. A13-0677, 2014 WL 502955, at *6 (Minn. Ct. App. Feb. 10, 2014)). Plaintiff's allegations fall on that side of the line: knowledge is alleged directly in multiple paragraphs, Compl. ¶¶ 13, 22, 27, 33, 37, and the circumstances – a supply-and-support relationship with a business whose wrong was on the face of its product – make actual knowledge plausible, not merely possible. What Lexis knew internally is, as in* Weulander*, a matter for discovery.

**E. The Complaint plausibly alleges that Lexis substantially assisted MyLife.**

Substantial assistance requires "[s]ome affirmative step", not "mere presence" or a "failure to object". *Zayed I*, 779 F.3d at 735 (quoting *Am. Bank of St. Paul v. TD Bank, N.A.*, 713 F.3d 455, 462 (8th Cir. 2013)); *Witzman*, 601 N.W.2d at 189. The Complaint alleges affirmative steps: Lexis supplied the personal data, provided customer service and technical support, and renewed the licensing agreements. Compl. ¶ 33. It supplied "the data and technical support" while MyLife "published the profiles and collected payments." *Id.* ¶ 37. And "[w]ithout

Lexis's data and cooperation, MyLife could not have published the false reputation profiles". *Id.* ¶ 34.

Lexis's authorities concern something different: inaction, or conduct judged on a full record. *Varga*'s "knowledge of a violation combined with inaction" passage addressed a bank's failure to alert investors: "Liability [must be] based on [U.S. Bank's] affirmative acts, not acts it should have taken." 952 F. Supp. 2d at 860–61 (quoting *Am. Bank*, 713 F.3d at 463) (emphasis omitted); *see* ECF No. 24 at 13–15. *Matthews v. Eichorn Motors, Inc.* affirmed summary judgment on an MHRA aiding-and-abetting claim where one defendant did not know of the harassment and the other, who knew, held no position with the company and did nothing; the court observed that courts "generally have held that a defendant's failure to act does not constitute 'substantial assistance.'" 800 N.W.2d 823, 830–32 (Minn. Ct. App. 2011). *Lind v. Slowinski* reversed a jury verdict against a car passenger under the rule limiting passenger liability, because there was "no agreement or substantial encouragement in the passengers' actions". 450 N.W.2d 353, 355–57 (Minn. Ct. App. 1990). Lexis is not alleged to have stood by. It is alleged to have supplied, serviced, and renewed. Compl. ¶¶ 13, 33, 37. Those are affirmative steps.

Nor was Lexis's assistance "general aid to the tortfeeasor." *Zayed I*, 779 F.3d at 735 (quotation omitted); *see* ECF No. 24 at 13. Lexis supplied the data from which the false profiles were built and the technical support that sustained

MyLife's use of it. Compl. ¶¶ 33–34, 37. In *Weullander*, the court found substantial assistance plausible because the fraudster "could not have transferred [the plaintiff's] funds out of her accounts if not for [the defendant's] processing", and held that whether that processing was "routine professional services" was the question to be decided. Slip op. at 15. The Complaint alleges the same but-for role: without Lexis's data and cooperation, MyLife could not have published the profiles. Compl. ¶ 34.

Lexis's principal response is that it had a "routine professional relationship" with MyLife and that routine services are not substantial assistance. ECF No. 24 at 15–16 (citing *Witzman*, 601 N.W.2d at 189). The "routine services" limitation comes from *Witzman*'s treatment of *professionals*—accountants, lawyers, and, by extension, banks—where the court was concerned that liability for "routine professional services" would compromise the professional-client relationship. 601 N.W.2d at 186–89; *see Zayed II*, 913 F.3d at 720. The Minnesota Supreme Court tied its heightened, particularized pleading requirement to "cases where aiding and abetting liability is alleged against professionals". *Witzman*, 601 N.W.2d at 187. Lexis is not a professional rendering confidential services to a client; it is a vendor supplying the raw material of the tortious product. And whether assistance is "routine" is a question of fact even for professionals. *Zayed I*, 779 F.3d at 735 ("These were not routine transfers"); *Weulander*, slip op. at 15.

Even in the professional setting, assistance that is specifically tailored to the wrong is not routine. Lexis did not sell a generic database to an anonymous buyer. It continued to service MyLife's use of that data after it knew how the data was used. Compl. ¶¶ 13, 33. Plaintiff's prior complaint quotes § 4.2 of the 2011 Agreement, titled "LN Teaser Results", as permitting MyLife to show teaser results to consumers "to market the services of Reseller's [MyLife's] Web Properties". ECF No. 1-2 ¶ 177 (alteration in original). Some profile information reached the public through search-engine "teaser" pages. *Wanna I*, slip op. at 2. And the Agreement forbids MyLife from identifying Lexis as its data provider. *Id.* at 14 (citing 2011 Agreement § 9.1.10). A supplier that authorizes the precise consumer-facing use and requires its own role to stay hidden is doing more than selling a commodity.

Because knowledge and assistance are weighed together, *Witzman*, 601 N.W.2d at 188, the strength of the knowledge allegations and the centrality of Lexis's contribution reinforce each other. At the pleading stage, that is enough. Whether Lexis's knowledge and assistance are ultimately proved is a question for discovery. *Zayed I*, 779 F.3d at 735.

## II. COUNT I STATES A DEFAMATION CLAIM AGAINST LEXIS AS A PARTICIPANT IN MYLIFE'S PUBLICATION.

**Lexis is liable as a participant, not as the speaker.** Lexis argues that "a defamation claim can only be made against an individual who actually

published the false or defamatory statement", "subject to narrow exceptions not relevant here". ECF No. 24 at 16–17 (citing *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1011 (8th Cir. 2005), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011); *Issaenko v. Univ. of Minn.*, 57 F. Supp. 3d 985, 1030 (D. Minn. 2014); *MacDonald v. Brodkorb*, 939 N.W.2d 468, 482 (Minn. Ct. App. 2020)). Whatever exceptions Lexis has in mind, concerted-action liability is the theory pleaded here. Count I does not allege that Lexis was the original speaker. It alleges that MyLife published the false statements, Compl. ¶ 21, that they reached third parties, *id.* ¶ 23, and that Lexis, knowing MyLife "would publish and monetise the profile", continued to supply data and services and thereby "participated in and facilitated the publication of defamatory statements", *id.* ¶ 22. Under Minnesota's "well recognized" rule, "all who actively participate in any manner in the commission of a tort, or who procure, command, direct, advise, encourage, aid, or abet its commission," are jointly and severally liable. *Witzman*, 601 N.W.2d at 185–86 (quotation omitted). None of Lexis's cases addresses that rule. *Pope* and *Issaenko* address claims against the alleged speaker. 406 F.3d at 1011; 57 F. Supp. 3d at 1030. *MacDonald* affirmed summary judgment and declined to hold a defendant liable for what a radio host and other Twitter users said about the plaintiff; the court did not address concerted-action or aiding-and-abetting liability. 939 N.W.2d at 482. Lexis's liability for MyLife's publication

therefore rises or falls with the aiding-and-abetting and conspiracy theories addressed in Parts I and IV—as Lexis itself frames it. ECF No. 24 at 18–19.

**The underlying defamation is pleaded with the required specificity.** Lexis next argues that the Complaint does not identify "to whom" the statements were made, relying on *Sherr v. HealthEast Care System*, 999 F.3d 589 (8th Cir. 2021), and *Bergh v. Zoelle*. ECF No. 24 at 16–18. The specificity rule exists "to put defendants on notice of the scope of the defamation claim" and to allow evaluation of privilege. *Sherr*, 999 F.3d at 597–98 (quotation omitted). The Complaint identifies the speaker (MyLife), the statements (that Plaintiff had court records and that her profile might contain criminal or graphic information, alongside a poor reputation score), the forum (MyLife's public website), and the recipients (prospective employers and members of the public who searched her name). Compl. ¶¶ 3, 12, 15, 21, 23. This Court has held a defamation claim based on a MyLife profile sufficiently pleaded where the plaintiff identified the statements verbatim, alleged that MyLife made them on its online profile, and alleged that MyLife made them "to [his] prospective employers, among others"; the court "found no such pleading requirement under Minnesota law" that a plaintiff name the viewers or the dates they viewed the profile. *Finlay v. MyLife.com Inc.*, 525 F. Supp. 3d 969, 983 (D. Minn. 2021). *Bergh* applied *Finlay*'s rule and found reports to identified agencies sufficient, but held insufficient statements to unidentified "healthcare providers throughout the Upper Midwest"

because the plaintiff failed to identify "any prospective employers" at all. *Bergh v. Zoelle*, No. 24-3054 (JRT/DLM), slip op. at 9–10 (D. Minn. June 23, 2025), ECF No. 57. *Cf. Finlay*, 525 F. Supp. 3d at 977 (job-seeker status and internet availability of the profile support an inference that third parties viewed it, for Article III purposes). *Sherr* also observed that plaintiffs "may not have to directly quote the allegedly defamatory words," although Minnesota "has generally required that in defamation suits, the defamatory matter be set out verbatim." 999 F.3d at 597–98 (quoting *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 326 (Minn. 2000)). The Complaint states the MyLife statements in substance. Compl. ¶¶ 12, 21. The verbatim statements—"ALERT: Court Records Found", that the profile "might include sensitive details gathered from Civil & Criminal Court records, & sexual offender list", and that it "may contain sensitive information & graphic content"—and the allegations that prospective employers consulted the profile and that MyLife and Lexis hold view counts and viewer IP addresses from which the viewers can be identified, are already set out in Plaintiff's prior complaint in this record, ECF No. 1-2 ¶¶ 5, 9–10, 107, 113–116, and the amended complaint will plead them. Plaintiff's claim is limited to the MyLife profile statements identified.

**The remaining elements are pleaded.** Each element is alleged: publication to third parties, including prospective employers, Compl. ¶ 23; falsity, *id.* ¶¶ 13, 21; reputational harm, *id.* ¶¶ 15, 25; and statements identifying Plaintiff by name,

*id.* ¶¶ 3, 12. *See McKee*, 825 N.W.2d at 729–30. Statements capable of being understood as accusing a person of a crime fall within a recognized category of defamation per se. *Maethner*, 929 N.W.2d at 875; *see* Compl. ¶ 24. Plaintiff also alleges actual harm—injury to her reputation, lost employment opportunities, and economic loss, together with emotional distress. Compl. ¶¶ 15, 25.

## III. COUNT II STATES CLAIMS UNDER THE CONSUMER FRAUD ACT AND THE DECEPTIVE TRADE PRACTICES ACT.

### A. The Consumer Fraud Act reaches "any person" who employs a deceptive practice in connection with a sale, and Lexis's conduct was a sale.

The Consumer Fraud Act prohibits "[t]he act, use, or employment by any person of any fraud, unfair or unconscionable practice, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby". Minn. Stat. § 325F.69, subd. 1 (2025). "Merchandise" includes "intangibles" and "services", and a "sale" includes any "offer for sale, or attempt to sell". Minn. Stat. § 325F.68, subds. 2, 4 (2025). "[A]ny person injured by a violation" may sue for damages and equitable relief. Minn. Stat. § 8.31, subd. 3a (2025). The plaintiff need not be a purchaser: private plaintiffs "are not required to be purchasers of the defendants' products in order to properly plead a claim under these statutes." *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 4 (Minn. 2001).

Lexis argues that Plaintiff identifies no conduct by Lexis "associated with the 'sale of any merchandise'". ECF No. 24 at 21. But Lexis's conduct *was* a sale: Lexis sold Plaintiff's personal data to MyLife. Compl. ¶¶ 1, 11, 27. Lexis does not contend otherwise; it assumes, for argument, that the data is "merchandise". ECF No. 24 at 21. That distinguishes both of Lexis's cases. In *Kraft v. Essentia Health*, the plaintiffs "ha[d] not plausibly alleged [the defendant pharmacy] engaged in the sale or advertisement of any merchandise." No. 3:20-cv-121, slip op. at 11 (D.N.D. May 27, 2022), ECF No. 192. In *Group Health Plan, Inc. v. Philip Morris Inc.*, the statements were congressional testimony, and the complaint alleged no attempt "to sell their products while" testifying. 68 F. Supp. 2d 1064, 1069 (D. Minn. 1999). Here, both the statements and the sales are commercial: MyLife displayed false warnings of "court records" and "graphic" or criminal information to sell reports to viewers and removal to the subject, Compl. ¶¶ 12, 21, 27, and Lexis sold MyLife the data "knowing that the data would be used to publish false or misleading profiles and to solicit payment from consumers", *id.* ¶ 27.

Lexis also says the Complaint identifies no misrepresentation by Lexis and no intent that others rely. ECF No. 24 at 20–22. The misrepresentations are MyLife's, and they were made precisely so that viewers and subjects would rely on them by paying. Compl. ¶¶ 12, 27–28. Lexis answers for them in two ways. The Act reaches "any person" whose "act, use, or employment" of a deceptive practice is "in connection with the sale of any merchandise"; it does not limit

liability to the party who utters the words. Minn. Stat. § 325F.69, subd. 1. And Lexis answers through the conspiracy pleaded in Count IV, which expressly reaches "consumer fraud". Compl. ¶ 38. *Cf. Leiendecker*, 848 N.W.2d at 228 n.2. *Leiendecker* describes conspiracy as vicarious liability "for some tortious act committed by another"; applying it to a statutory consumer-fraud violation extends that description to a statutory wrong of the same character, and nothing in the Act's text forecloses it. Lexis's only response is that the aiding-and-abetting theory fails, ECF No. 24 at 21, 22 n.4; for the reasons in Part I, it does not. The theory is one of affirmative misrepresentation, not omission, so the duty-to-disclose requirement for omission-based claims does not apply. *See Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*, 850 N.W.2d 682, 695–96 (Minn. 2014).

**B. The Complaint pleads a causal nexus.**

Lexis says the Complaint alleges no relationship "between anything Lexis said or did when it sold data to MyLife and Wanna's alleged injury." ECF No. 24 at 22 (citing *Varela v. State Farm Mut. Auto. Ins. Co.*, 655 F. Supp. 3d 813, 823 (D. Minn. 2023), *appeal dismissed*, 98 F.4th 902 (8th Cir. 2024)). The Act requires "a causal nexus between the conduct alleged to violate [the statute] and the damages claimed", but it does not require a plaintiff "to plead reliance by individual purchasers". *Grp. Health*, 621 N.W.2d at 4. Reliance on the statements

remains part of the causal nexus, *id.* at 13, but in a case involving "a lengthy course of prohibited conduct that affected a large number of consumers," it may be shown by "other direct or circumstantial evidence". *Id.* at 14. In *Group Health*, the plaintiffs were health plans alleging that they were "indirectly injured" by the defendants' deceptive conduct through the medical costs of their members. *Id.* at 4–5. And this Court has found a nexus plausible where the chain ran from the defendant's misrepresentations, through third parties' conduct, to the plaintiff's injury. *McDougall v. CRC Indus., Inc.*, No. 20-cv-1499 (JRT/LIB), slip op. at 20 (D. Minn. Mar. 3, 2021), ECF No. 43, *reported at* 523 F. Supp. 3d 1061, *rev'd on other grounds*, No. 24-3614 (8th Cir. Feb. 10, 2026).

Plaintiff's injury follows that path. Lexis sold the data, MyLife built and published the profile from it, prospective employers and members of the public "were led to believe that plaintiff had criminal or graphic records", and she lost employment opportunities as a result. Compl. ¶¶ 12–15, 23, 28–29, 34. Chief Judge Schiltz found the same chain sufficient for Article III traceability even without agency: "the complaint alleges that Lexis is a but-for cause of Wanna's injury because it sold Wanna's information to MyLife." *Wanna I*, slip op. at 9. Proximate cause is a fact question for another day.

**C. The claim benefits the public..**

Lexis does not argue the public-benefit requirement of *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000), and the Complaint satisfies it in any event. *Ly* held that the private attorney general statute did not reach a plaintiff "defrauded in a single one-on-one transaction in which the fraudulent misrepresentation . . . was made only to appellant." *Id.* The public benefit is present where the misrepresentations were made "to the public at large." *Collins v. Minn. Sch. of Bus., Inc.*, 655 N.W.2d 320, 330 (Minn. 2003). MyLife's representations were broadcast on the internet to anyone who searched a name, and Plaintiff seeks relief for a class of Minnesota residents subjected to the same practice. Compl. ¶¶ 12, 16, 23; *id.*, Prayer ¶ 4.

**D. The Deceptive Trade Practices Act claim.**

A person engages in a deceptive trade practice when, "in the course of business, vocation, or occupation," the person "engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Minn. Stat. § 325D.44, subd. 1(14) (2025). Lexis's list of the statute's categories omits that clause. ECF No. 24 at 22 (citing subd. 1(2), (4), (5), (11)). Subdivision 1(14) is a catch-all for conduct that creates a likelihood of confusion or misunderstanding, and supplying the data that powers profiles suggesting court records that do not exist is such conduct. Compl. ¶¶ 12–13, 27.

The remedy is an injunction for "[a] person likely to be damaged by a deceptive trade practice of another", and "[p]roof of monetary damage, loss of profits, or intent to deceive is not required." Minn. Stat. § 325D.45, subd. 1 (2025). Lexis argues that the Complaint alleges only past harm, and that MyLife filed for bankruptcy in 2022. ECF No. 24 at 23–24 (citing *McDougall*, 523 F. Supp. 3d at 1076; *Gisairo v. Lenovo (United States) Inc.*, 516 F. Supp. 3d 880, 890 (D. Minn. 2021)). Plaintiff must allege "a threat of future harm" to herself. *Gisairo*, No. 19-cv-2727 (WMW/LIB), slip op. at 13 (D. Minn. Feb. 2, 2021), ECF No. 45. The Complaint alleges an ongoing course of conduct—Lexis "continued to supply data and assistance", Compl. ¶ 13—and seeks relief against sales to MyLife "or similar entities", *id.*, Prayer ¶ 4. Unlike the laptop purchaser in *Gisairo*, whose future harm depended on his own speculative decision to buy again, slip op. at 13–14, Plaintiff's exposure depends only on whether Lexis keeps selling her data to publishers of such profiles. If the Court finds the future-harm allegations too thin, Plaintiff asks that any dismissal of this claim be without prejudice so that any further facts bearing on future harm can be pleaded. *See* Part V.

## IV. COUNT IV STATES A CLAIM FOR CIVIL CONSPIRACY.

Lexis argues that the conspiracy claim fails for want of an underlying tort and because Plaintiff alleges no agreement beyond "an arms-length, data licensing agreement". ECF No. 24 at 24–25 (citing *Tatone v. SunTrust Mortg., Inc.*,

857 F. Supp. 2d 821, 838 (D. Minn. 2012); *Bank of Montreal v. Avalon Capital Grp., Inc.*, 743 F. Supp. 2d 1021, 1033 (D. Minn. 2010)). Both points fail.

The first is correct as a statement of law and irrelevant on these pleadings. A civil conspiracy claim "requires an underlying tort." *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 986 (8th Cir. 2008); *see Leiendecker*, 848 N.W.2d at 228 n.2. The underlying torts here—defamation and consumer fraud—are adequately pleaded. *See* Parts I–III, *supra*; Compl. ¶ 38. *Bank of Montreal* dismissed a count for "Conspiracy to Breach Contract" because "simply breaching a contract is not a tort", 743 F. Supp. 2d at 1033; nothing like that is alleged here. And *Wanna I* did not reject a conspiracy to defame, as Lexis suggests, ECF No. 24 at 25; in explaining why it lacked jurisdiction, the court noted that a conspiracy claim premised on the dismissed federal claims had no underlying tort, and it did not reach the merits of the state-law claims. *Wanna I*, slip op. at 20–21.

On the second point, the standard is whether the Complaint alleges facts "to allow a reasonable inference that defendants agreed to accomplish an unlawful purpose and took concerted actions to achieve that purpose." *Tatone*, 857 F. Supp. 2d at 838. "A conspiracy is a combination of persons to accomplish an unlawful purpose or a lawful purpose by unlawful means." *Harding v. Ohio Cas. Ins. Co.*, 230 Minn. 327, 337, 41 N.W.2d 818, 824 (1950). A combination whose *purpose* is unlawful is actionable whatever form the combination takes. Here the combination itself is undisputed; Lexis has filed the contract. ECF Nos. 20, 20-1,

21. The question is whether the Complaint plausibly alleges that the combination's object was unlawful, *cf. Twombly*, 550 U.S. at 556–57 (conclusory allegation of agreement insufficient to show illegality), and it does. Lexis and MyLife "agreed to a common design to monetise personal data by publishing misleading reputation profiles and soliciting payments from consumers", dividing the work between them, with Lexis knowing that the arrangement "would harm individuals like plaintiff." Compl. ¶ 37. The concerted action is pleaded: Lexis supplied the data and technical support, MyLife published and collected, and Lexis profited. *Id.* ¶¶ 14, 37.

Lexis points to "safeguards" in Appendix 3 of the Agreement: a requirement that MyLife's customers use the data only for a "lawful" use, and a prohibition on uses that violate the Fair Credit Reporting Act. ECF No. 24 at 25. Those provisions cut the other way. A licensor that writes use restrictions into its contract contemplates the misuse they describe. Whether Lexis enforced those restrictions, or renewed the license while MyLife openly did what the restrictions forbid, is a question of fact, and the Agreement, as described in the prior complaint and in *Wanna I*—authorizing consumer-facing "teaser" displays and forbidding disclosure of Lexis's role—is at least as consistent with a joint design to market the profiles as with a passive license. ECF No. 1-2 ¶ 177; *Wanna I*, slip op. at 2, 14.

**V. ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE.**

Lexis's memorandum asks the Court to "dismiss Plaintiff's Complaint". ECF No. 24 at 25. It offers no reason why any dismissal should be with prejudice. The Court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *see Foman v. Davis*, 371 U.S. 178, 182 (1962). This is Plaintiff's first complaint in this action, and no court has ruled on the sufficiency of her state-law claims. *Wanna I*, slip op. at 21; *Wanna II*, slip op. at 6. Lexis's own lead authority on knowledge dismissed without prejudice because the plaintiffs "could potentially remedy these defects with additional factual detail regarding knowledge and substantial assistance". *Lusk*, 213 F. Supp. 3d at 1137.

A request for leave made only in an opposition brief, without a motion and proposed pleading, does not preserve the right to amend. *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 884–85 (8th Cir. 2009); *Drobnak*, 561 F.3d at 787–88; *see* D. Minn. LR 15.1(b). Plaintiff will therefore move under LR 15.1. The amendment would add facts that go directly to knowledge, substantial assistance, and the object of the combination, including: the December 2021 injunction against MyLife and Lexis's continued supply of data after it, ECF No. 1-2 ¶¶ 54–56; *MyLife* Order at 11; the volume of public complaints about MyLife, ECF No. 1-2 ¶¶ 52–53; the relationship's history since 2007, including nine amendments to the 2011 Agreement, *id.* ¶¶ 68(d), 72, 177; the "LN Teaser Results" and anonymity provisions, *id.* ¶ 177; *Wanna I*, slip op. at 14; Lexis's linking

services, ECF No. 1-2 ¶ 68(c); Lexis's characterization of non-criminal petty misdemeanors as "criminal" records in the data it supplied, *id.* ¶¶ 47–48, 170–171; Lexis's share in MyLife's revenues, *id.* ¶¶ 35, 39, 176; and the MyLife profile statements verbatim, *id.* ¶¶ 5, 9–10. Those facts are not futile. At minimum, any dismissal should be without prejudice.

## CONCLUSION

Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss. In the alternative, Plaintiff requests that any dismissal be without prejudice and that the Court set a deadline for Plaintiff to move for leave to file an amended complaint under LR 15.1.

Dated: October 8, 2026

Respectfully submitted,

**MADGETT LAW, LLC**

By: /s/ David J.S. Madgett
David J.S. Madgett (MN #390494)
IDS Center, Suite 1650
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612-470-6529
Email: dmadgett@madgettlaw.com
*Attorney for Plaintiff Melissa Wanna*