UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MELISSA WANNA,<br><br>*Plaintiff*,<br><br>v.<br><br>RELX Group plc; Reed Elsevier Inc. d/b/a LexisNexis; RELX Inc. d/b/a LexisNexis; LexisNexis Risk Solutions Inc.; LexisNexis Risk Solutions FL Inc.,<br><br>*Defendants*. | Case No. 26-cv-2556<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. Wanna's Complaint Should Be Dismissed .......... 3

A. Wanna's Aiding and Abetting Theory Fails on the Pleadings .......... 3

1. The Complaint Fails to Plausibly Allege Lexis had Actual Knowledge of MyLife's Tortious Conduct .......... 5

2. The Complaint Does Not Plausibly Allege Lexis Substantially Assisted MyLife's Tortious Conduct .......... 8

B. The Failure of Wanna's Aiding and Abetting Theory Is Fatal to All Her Other Claims .......... 11

1. Wanna's Defamation Claim Fails Because Lexis Made No Defamatory Statement and the Complaint Identifies No Recipient. 12

2. Wanna's Consumer Fraud Act Claim Fails Because She Concedes the Alleged Misrepresentations Were MyLife's, Not Lexis's .......... 15

3. Wanna's Deceptive Trade Practices Act Claim Fails Because She Identifies No Deceptive Practice by Lexis and No Threat of Future Harm .......... 17

4. Wanna's Civil Conspiracy Claim Fails Because She Pleads No Underlying Tort and No Agreement to Accomplish an Unlawful Purpose .......... 19

II. Wanna's Complaint Should Be Dismissed With Prejudice .......... 20

CONCLUSION .......... 22

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. First Nat'l Bank*,
303 Minn. 408 (Minn. 1975) .......... 2

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 9, 15

*Bank of Montreal v. Avalon Cap. Grp., Inc.*,
743 F. Supp. 2d 1021 (D. Minn. 2010) .......... 19

*Finlay v. MyLife.com Inc.*,
525 F. Supp. 3d 969 (D. Minn. 2021) .......... 14

*Foman v. Davis*,
371 U.S. 178 (1962) .......... 21

*Health Plan, Inc. v. Philip Morris, Inc.*,
68 F. Supp. 2d 1064 (D. Minn. 1999) .......... 15

*In re 2007 Novastar Fin. Inc., Sec. Litig.*,
579 F.3d 878 (8th Cir. 2009) .......... 21

*Issaenko v. Univ. of Minn.*,
57 F. Supp. 3d 985 (D. Minn. 2014) .......... 13

*Lind v. Slowinski*,
450 N.W.2d 353 (Minn. Ct. App. 1990) .......... 10

*Lusk v. Life Time Fitness, Inc.*,
213 F. Supp. 3d 1119 (D. Minn. 2016) .......... 7, 8, 9, 10

*MacDonald v. Brodkorb*,
939 N.W.2d 468 (Minn. Ct. App. 2020) .......... 13

*Matthews v. Eichorn Motors, Inc.*,
800 N.W.2d 823 (Minn. Ct. App. 2011) .......... 10

*Metge v. Baehler*,
762 F.2d 621 (8th Cir. 1985) .......... 10

*Pope v. ESA Servs., Inc.*,
406 F.3d 1001 (8th Cir. 2005) ........................................................................ 12

*Varga v. U.S. Bank Nat'l Ass'n*,
952 F. Supp. 2d 850 (D. Minn. 2013)................................................................4, 5, 8, 9

*Wanna v. RELX Grp., PLC*,
142 F.4th 1102 (8th Cir. 2025) .......................................................................passim

*Wanna v. RELX Grp., PLC*,
No. 23-cv-1769 (PJS/JFD), 2024 WL 1345176 (D. Minn. Mar. 29, 2024) .................... 2

*Weulander v. N. Star Credit Union*,
No. 23-cv-885 (JRT/LIB), 2024 U.S. Dist. LEXIS 21167 (D. Minn. Feb. 7, 2024).. 7, 8, 9, 10

*Witzman v. Lehrman, Lehrman & Flom*,
601 N.W.2d 179 (Minn. 1999) ..........................................................................6, 10

*Zayed v. Associated Bank, N.A.*,
779 F.3d 727 (8th Cir. 2015) ..........................................................................3, 8, 9

*Zayed v. Associated Bank, N.A.*,
913 F.3d 709 (8th Cir. 2019) ........................................................................... 3

**Statutes**

28 U.S.C. § 1927 ............................................................................................ 22

Minn. Stat. § 325D.44 ...................................................................................... 18

## INTRODUCTION

Wanna's Opposition[1] confirms what Lexis explained in its opening brief: the Complaint seeks to hold Lexis liable for MyLife's alleged misconduct based on nothing more than an arm's-length data-licensing relationship. Wanna has tried this before. Her prior lawsuit against Lexis involved the same parties, the same data-licensing relationship, and the same alleged misconduct by MyLife; the only thing that has changed is the legal theory Wanna uses to try to make Lexis answer for MyLife's conduct. Agency and ratification failed then, and aiding and abetting fails now. Wanna concedes every allegedly false statement was made by MyLife, and Lexis's liability on each claim "rises or falls" with her aiding-and-abetting and conspiracy theories. Opp. at 18–20, 23. But those theories cannot bear the weight Wanna places on them. The Complaint pleads no specific facts plausibly showing Lexis actually knew MyLife was allegedly publishing false statements about Wanna—only conclusory assertions that Lexis "knew" because it licensed data and because MyLife's business model was "publicized." Nor does the Complaint allege any affirmative step by Lexis directed at MyLife's alleged torts. This Court and the Eighth Circuit have already recognized Wanna's allegations show "no relationship beyond . . . arm's length transactions" between Lexis and MyLife, and both courts rejected Wanna's theory that Lexis ratified MyLife's alleged torts. *Wanna v. RELX Grp., PLC*, 142 F.4th 1102 (8th Cir. 2025); *Wanna v. RELX Grp., PLC*, No. 23-cv-1769

---

[1] Wanna's Opposition to Lexis's Motion to Dismiss was filed on October 8, 2026, Dkt. 38—three months after the filing deadline. Dkt. 18.

(PJS/JFD), 2024 WL 1345176, at *5 (D. Minn. Mar. 29, 2024), *aff'd*, 142 F.4th 1102 (8th Cir. 2025). Like aiding and abetting, ratification requires "full knowledge of all the material facts." *Anderson v. First Nat'l Bank*, 303 Minn. 408, 410 (Minn. 1975). Wanna's failure to plead that knowledge doomed her ratification theory, and it dooms her aiding-and-abetting theory for the same reason. Relabeling the same arm's-length relationship, on the same allegations, as "aiding and abetting" or "conspiracy" does not change that conclusion.

Wanna's remaining claims fail on their own terms as well. Her defamation claim identifies no statement by Lexis and no third-party recipient—defects her Opposition effectively concedes by pointing to allegations in her *prior* complaint.[2] Opp. at 21. Her Consumer Fraud Act claim identifies no misrepresentation by Lexis made in connection with its sale of data to MyLife, and her Deceptive Trade Practices Act claim identifies neither a deceptive practice by Lexis nor any threat of future harm. Finally, Wanna's civil conspiracy claim rests on no viable underlying tort and no agreement beyond a lawful commercial contract. Because this is Wanna's second lawsuit against Lexis arising from the same alleged conduct, and the "additional facts" she proposes to plead would not cure these deficiencies, the Complaint should be dismissed in its entirety and with prejudice. No new legal theory can change the factual allegations, and allowing Wanna yet another

[2] While Wanna relies on her prior complaint to resist dismissal, she disavows the allegations made therein in connection with her Motion to Remand.

attempt at this lawsuit would only force Lexis and the Court to spend further time and resources on claims that cannot succeed.

## ARGUMENT

### I. Wanna's Complaint Should Be Dismissed

#### A. Wanna's Aiding and Abetting Theory Fails on the Pleadings

At the outset, Wanna agrees that aiding and abetting is "not an independent tort, but a theory of liability," Opp. at 7–8 (quoting *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 714 (8th Cir. 2019)), so there is no dispute that Count III should be dismissed to the extent it is pleaded as an independent claim. To the extent Wanna raises aiding and abetting as a theory of liability, that, too, fails as a matter of law because Wanna's Complaint does not plausibly allege two of the three elements required to establish liability under such a theory. See Lexis's Mem. of Law in Supp. of Mot. to Dismiss ("Mot.") at 6–11.

First, Wanna offers nothing beyond bald-face, conclusory allegations about Lexis's purported knowledge of MyLife's alleged tort—but the Eighth Circuit has made clear that *actual knowledge* of the *wrongful* nature of the alleged misconduct is required.[3] *See Zayed*,

---

[3] While Wanna states knowledge "may be alleged generally," under Rule 9(b), Opp. at 6, she also recognizes that Rule 9(b) "does not give [a party] license to evade the less rigid-though still operative-strictures of Rule 8." *Zayed v. Associated Bank, N.A.*, 779 F.3d 727, 733 (8th Cir. 2015) (citation omitted). Wanna must still plead facts from which actual knowledge can plausibly be inferred. In *Zaye*d, the plaintiff did exactly that, alleging specifically that the defendant's officer knew the account holder was an unregistered entity, signed a form falsely stating it was organized in Minnesota, knew the funds were meant for a Swiss trader yet never saw them sent there, and personally approved millions of dollars in transfers to a non-signatory's personal accounts. *Id.* at 733-34. Wanna, by contrast, alleges only that Lexis licensed data to MyLife and that MyLife's business model was "publicized." Compl. ¶¶ 1, 13, 33. These scant allegations fail, even under Rule 9(b).

913 F.3d at 714. Constructive knowledge, mere awareness of the conduct in question, red flags, and even gross negligence are not enough. *Varga v. U.S. Bank Nat'l Ass'n*, 952 F. Supp. 2d 850, 857–58 (D. Minn. 2013). The Complaint's conclusory allegations that Lexis "knew" of MyLife's misconduct because Lexis was the "primary source of the data" and MyLife's "business model was publicized," Compl. ¶¶ 1, 13, 33, fall short of alleging actual knowledge by Lexis that MyLife was using the data to publish false statements about Wanna.

Second, Wanna fails to allege substantial assistance—rather than identify any actual instances of affirmative encouragement or assistance by Lexis (as required), Wanna attempts to impute liability from nothing more than Lexis's arm's-length sale of data to MyLife. That is routine commercial activity, not substantial assistance in the commission of a tort. For these two independently sufficient reasons, Wanna's aiding and abetting claim should be dismissed, as should all of her other claims, which *all* rely on an aiding and abetting theory of liability to reach Lexis.

Wanna's counterarguments are unavailing.[4]

---

[4] While aiding and abetting is a different legal theory than those rejected from her first Complaint, it rests on the identical fact allegations that both this Court and the Eighth Circuit already found insufficient to establish agency or ratification. As explained below, these same allegations cannot plausibly establish the actual knowledge of wrongdoing that aiding and abetting requires, so the fact that this Court and the Eighth Circuit "did not decide the [aiding and abetting] theory pleaded here," Opp. at 2, is irrelevant.

#### 1. The Complaint Fails to Plausibly Allege Lexis had Actual Knowledge of MyLife's Tortious Conduct

With respect to the actual knowledge requirement, Wanna points to five paragraphs of the Complaint she contends plead "knowledge of the wrong – false profiles to extract payment." Opp. at 11. But each of the allegations Wanna cites merely asserts Lexis "knew" or "was aware" of MyLife's misconduct, without pleading any detail that would make those generalized assertions of knowledge plausible. Opp. at 11–12, 15–16 (citing Compl. ¶¶ 13, 22, 27, 33, 37). Wanna nowhere identifies how Lexis acquired knowledge of what MyLife was allegedly doing, let alone knowledge that MyLife's conduct was unlawful. At most, the Complaint alleges Lexis "knew" about MyLife's conduct because MyLife used Lexis's data and because MyLife's "business model was publicized." Compl. ¶¶ 13, 33. The Eighth Circuit has already held that materially identical allegations fall short. In rejecting Wanna's ratification theory, the Court of Appeals concluded that Wanna "has not connected Lexis with the specific uses to which MyLife put data purchased from Lexis, or any facts suggesting Lexis approved of those uses." *Wanna*, 142 F.4th at 1107. And in rejecting her apparent-authority theory, the Court of Appeals held that the allegations that "Lexis offered information for sale, and it knew it was selling to MyLife" were "insufficient" to make Lexis MyLife's agent. *Id.* Wanna's new Complaint changes nothing: its conclusory allegations that Lexis "knew" about MyLife's operation constitute at most awareness of *conduct*, as distinct from knowledge of its wrongfulness, that courts in Minnesota have held insufficient. *Varga*, 952 F. Supp. 2d at 857–58.

Wanna's suggestion that (1) the relationship between Lexis and MyLife; (2) nature of MyLife's conduct; (3) nature of Lexis's assistance to MyLife; and (4) Lexis's state of mind provide "circumstantial support" for Lexis's claimed knowledge, Opp. at 11, fails to salvage her claim.

*First*, as Wanna concedes, a relationship between the defendant and the primary tortfeasor "may support an inference that the defendant knew of a customer's dealings, not that it knew the dealings were wrongful." Opp. at 12 (citing *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 188 (Minn. 1999)). Lexis's alleged status as MyLife's "primary data source," its renewal of the license, and its provision of "customer service and technical support," Compl. ¶¶ 12, 33, show at most Lexis *knew MyLife* used its data. They do not show Lexis knew MyLife was publishing false information about Wanna. Indeed, the Eighth Circuit has already characterized Lexis and MyLife's relationship as nothing more than "arm's length transactions," and held that Lexis's knowledge "it was selling to MyLife" was insufficient to make Lexis answerable for MyLife's conduct. *Wanna*, 142 F.4th at 1106–07.

*Second*, the fact that MyLife conducted its business "in public, on the internet," and that its "business model was publicized," Opp. at 12 (citing Compl. ¶¶ 3, 12, 23, 33), says nothing about whether Lexis knew that any particular profile, much less Wanna's specifically, falsely implied the existence of court records. Wanna tries to fill the gap by pointing to a 2021 stipulated injunction prohibiting MyLife from falsely implying that a profile subject had a criminal record. Opp. at 12–13. But as Wanna concedes, that injunction "is not pleaded in the Complaint," Wanna does not allege that Lexis was aware

of the injunction, and Wanna admits that she does not offer it "as proof of what Lexis knew." Opp. at 12–14 & n.2. Nothing in the Complaint plausibly alleges that Lexis *actually knew* MyLife was engaging in wrongdoing.

*Third*, Wanna's allegations that Lexis's data formed "the substance of the profiles" and that Lexis "profited from the arrangement," Opp. at 14 (citing Compl. ¶¶ 1, 12, 14, 34), describe an ordinary commercial data license—not awareness of wrongdoing. Further, Wanna's argument about Lexis's "state of mind" is circular. She argues Lexis continued to sell data to MyLife "after it knew" of MyLife's misconduct, Opp. at 14 (citing Compl. ¶ 13), but that assumes the knowledge she has failed to plausibly plead. Ultimately, these factors show nothing more than an arm's-length commercial relationship, *see Wanna*, 142 F.4th at 1106, and cannot supply the "specific facts" of actual knowledge Minnesota law requires, *Lusk v. Life Time Fitness, Inc.*, 213 F. Supp. 3d 1119, 1136 (D. Minn. 2016); *Varga*, 952 F. Supp. 2d at 857–58.

Wanna's cited authorities do not help her case. Wanna primarily relies on *Weulander v. N. Star Credit Union*, No. 23-cv-885 (JRT/LIB), 2024 U.S. Dist. LEXIS 21167 (D. Minn. Feb. 7, 2024), for the proposition that courts can "infer[ ] actual knowledge from circumstances." Opp. at 14. But in *Weulander*, the court declined to dismiss an aiding and abetting claim specifically because it could infer that a credit union had actual knowledge of wrongdoing where it processed 68 "highly suspicious" overseas transfers initiated by a "third party linked to an IP address in Indonesia [that] made multiple, incorrect password attempts to gain access to [Plaintiff's] accounts, and then changed the password," "repeatedly logged into the online bank account[ ] 53 times over

the course of four days." *Weulander*, 2024 U.S. Dist. LEXIS 21167, at *6. The factual allegations permitting the inference of actual knowledge in *Weulander*, therefore, are a far cry from the conclusory allegations Wanna offers here. The same is true in *Zayed*, where the bank employee knew specific, concrete facts that suggested wrongdoing—including that the account holder was not registered and a non-signatory was making withdrawals from that account. Opp. at 9–10 (citing *Zayed*, 779 F.3d at 733–35). Ultimately, the cases Wanna cites simply illustrate the type of plausible allegations of knowledge required to survive dismissal—and highlight the defect in her own allegations.[5]

### 2. The Complaint Does Not Plausibly Allege Lexis Substantially Assisted MyLife's Tortious Conduct

With respect to substantial assistance, Wanna alleges Lexis took "affirmative steps" to assist MyLife's wrongful conduct by (1) supplying data to MyLife, (2) providing "customer service and technical support," and (3) renewing its licensing agreements. Opp. at 15. None of these actions constitute "substantial assistance" under Minnesota law, which requires an "affirmative step" that is a "substantial factor" in causing the breach of duty,

---

[5] Wanna's attempts to distinguish Lexis's authorities—*Lusk*, 213 F. Supp. 3d at 1136–37, and *Varga*, 952 F. Supp. 2d at 857-58—are also unpersuasive. In *Lusk*, the court dismissed an aiding and abetting claim on the pleadings where the facts "suggest[ed] an arm's length transaction" between the defendant bank and individuals who allegedly breached their fiduciary duties to plaintiff, and the dismissal was "without prejudice" only because plaintiffs "could potentially remedy these defects with additional factual detail." Opp. at 14 (quoting *Lusk*, 213 F. Supp. 3d at 1137). But this is Wanna's second lawsuit arising from the same underlying factual allegations—any amendment would be futile, as explained *infra* Part II. Wanna recognizes that the dismissal in *Varga* was warranted because the complaint "lack[ed] . . . facts suggesting the bank had actual knowledge such conduct is wrongful," Opp. at 14 (quoting *Varga*, 952 F. Supp. 2d at 858)—the same problem that plagues Wanna's Complaint here. *See supra* Part I.A.1.

which affirmative step "must further the [tort] itself, [rather than] merely constitute general aid to the tortfeasor." *Lusk*, 213 F. Supp. 3d at 1136; *Weulander*, 2024 U.S. Dist. LEXIS 21167, at *6. The conduct Wanna identifies is nothing more than the ordinary performance of an arm's-length commercial contract. *See Wanna*, 142 F.4th at 1106. That MyLife then chose to use that data in a manner allegedly *contrary to the express terms of the Lexis licensing agreement* to allegedly unlawfully publish misleading "reputation profiles" and solicit payment for their removal was MyLife's choice—and MyLife's alone. *See* Compl. ¶¶ 12, 21, 27. Wanna does not allege Lexis drafted, suggested, reviewed, or approved the content of any MyLife profile. Lexis's provision of data is, at most, "general aid to the tortfeasor"—not a "substantial factor" in MyLife's alleged defamation or consumer protection violations. *Weulander*, 2024 U.S. Dist. LEXIS 21167, at *6; *see Witzman*, 601 N.W.2d at 189 (routine services provided to a tortfeasor are not substantial assistance).[6]

Again, Wanna's discussion of caselaw is off base. Wanna criticizes Lexis for relying on cases that involved "inaction," because, in her view, Lexis is "alleged to have supplied, serviced, and renewed." Opp. at 16 (citing *Varga*, 952 F. Supp. 2d at 857–58;

---

[6] To the extent Wanna suggests that whether Lexis's conduct was "routine" is a fact question for the jury, Opp. at 15, that argument is irrelevant because Wanna must still plead specific facts from which Lexis's liability can plausibly be inferred. *See Ashcroft v. Iqba*l, 556 U.S. 662, 678 (2009). *Zaye*d, the only case she cites, does not hold otherwise. There, the Eighth Circuit concluded that the defendant's *specifically pleaded conduc*t did not constitute "routine" or "quintessential banking activities," such that a jury could reasonably infer actual knowledge and substantial assistance. *Zaye*d, 779 F.3d at 735. Wanna pleads nothing comparable. The Complaint alleges only an arm's-length commercial data-licensing relationship, *see Wann*a, 142 F.4th at 1106, with no specific facts plausibly alleging any basis to hold Lexis accountable for MyLife's conduct.

*Matthews v. Eichorn Motors, Inc.*, 800 N.W.2d 823, 830–32 (Minn. Ct. App. 2011); and *Lind v. Slowinski*, 450 N.W.2d 353, 355–57 (Minn. Ct. App. 1990)). But as explained above, Lexis's supply of data, provision of services, and renewal of licensing agreements were not in any way directed towards MyLife's allegedly unlawful conduct. Those may be "affirmative steps" towards the execution of an arm's length commercial transaction—but not "affirmative steps" towards the commission of a tort. Opp. at 16.

Wanna's attempt to avoid *Witzman*'s "routine services" principle also fails. Wanna argues that the principle applies only to "professionals" and that Lexis is instead "a vendor supplying the raw material of the tortious product." Opp. at 17. But nothing in *Witzman* suggests a commercial data vendor should face *broader* aiding and abetting exposure than a professional for the ordinary performance of business obligations; the concern that liability for routine services would chill legitimate business relationships applies with equal force here. *See Witzman*, 601 N.W.2d at 186–89. Nor does *Weulander* help Wanna. The fact a tortfeasor "could not have" acted "if not for" a defendant's services, Opp. at 17, does not make a defendant's conduct an "affirmative step" that furthers the tort itself. *Lusk*, 213 F. Supp. 3d at 1136; *Weulander*, 2024 U.S. Dist. LEXIS 21167, at *6; *see also Metge v. Baehler*, 762 F.2d 621, 624 (8th Cir. 1985) (noting that aiding and abetting liability requires proof of proximate causation). Under Wanna's theory, every supplier of information later misused by a customer would be an aider and abettor.

Wanna's effort to show that Lexis's assistance was "specifically tailored to the wrong" fares no better. Opp. at 18. The provision of the 2011 Agreement on which she relies permits teaser results "to market the services of Reseller's Web Properties"—it says

nothing about publishing misleading "reputation profiles" or charging consumers to remove them. *Id.* (quoting Dkt. 1-2 ¶ 177). And a contractual term keeping a data vendor's identity confidential is an ordinary commercial term, not evidence Lexis designed or endorsed MyLife's alleged misconduct—particularly where, as Wanna concedes, the same agreement prohibits the very alleged uses she challenges. *See* Compl. ¶¶ 12, 21, 27. Because Wanna alleges only routine commercial dealings, her substantial assistance allegations fail as a matter of law.

* * *

Wanna's relabeling of the same factual allegations this Court and the Eighth Circuit already rejected as "aiding and abetting" does not change the ultimate conclusion that she has no plausible legal basis to hold Lexis liable for MyLife's alleged misconduct. Wanna's observation that knowledge and substantial assistance are weighed "in tandem," Opp. at 8, does not help her where she has plausibly alleged neither element.

### B. The Failure of Wanna's Aiding and Abetting Theory Is Fatal to All Her Other Claims

This Court and the Eighth Circuit have already held the facts Wanna pleads show "no relationship beyond those arm's length transactions" between Lexis and MyLife. *Wanna*, 142 F.4th at 1106; *see* Opp. at 8. Wanna now expressly disclaims agency, Compl. ¶ 11, but calling the same relationship "aiding and abetting" does not change what is alleged. Because the Complaint pleads neither actual knowledge nor substantial assistance, Count III should be dismissed. Counts I, II, and IV should also be dismissed—both as

standalone claims pleaded directly against Lexis, and to the extent they rest on Wanna's misguided aiding and abetting theory. See Br. 9–11, 13–14, 16, 18.

### 1. Wanna's Defamation Claim Fails Because Lexis Made No Defamatory Statement and the Complaint Identifies No Recipient

As Lexis explained in its opening brief, Wanna's defamation claim fails—whether pleaded directly or derivatively against Lexis. For one thing, *every* allegedly defamatory statement identified in the Complaint was made by MyLife, not Lexis, *see* Compl. ¶¶ 12, 13, 21, and the *only* conduct the Complaint attributes to Lexis is "provid[ing] MyLife with the personal data underlying the profile." Compl. ¶ 22. Providing data does not involve making "a false and defamatory statement." *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1011 (8th Cir. 2005). The claim independently fails because the Complaint does not identify any recipient of the allegedly defamatory statements. While Wanna alleges that she "believes" the MyLife profile harmed her employment prospects and that she "lost employment opportunities," she identifies no prospective employer or other third party who viewed the profile or took adverse action because of it. Compl. ¶¶ 3, 15, 23. These allegations are insufficient to state a defamation claim against Lexis, and her attempt to impute liability to Lexis on the grounds that Lexis "participated in and facilitated" MyLife's defamatory conduct fails for the reasons set forth above. *See supra* Part I.A.

Wanna's counterarguments do not salvage her claim. In fact, Wanna concedes the central defect of her claim by acknowledging that Count I "does not allege that Lexis was the original speaker," and that "Lexis is liable as a participant, not a speaker." Opp. at 18–19. Subject to narrow exceptions, a defendant cannot be held liable for statements made

by others. *MacDonald v. Brodkorb*, 939 N.W.2d 468, 482 (Minn. Ct. App. 2020); *Issaenko v. Univ. of Minn.*, 57 F. Supp. 3d 985, 1030 (D. Minn. 2014). Wanna does not, and cannot, identify any such statement by Lexis, because every allegedly defamatory statement in the Complaint was made by MyLife. *See* Compl. ¶¶ 12, 13, 21. She is therefore left to argue that Lexis is derivatively liable for MyLife's statements. On that point, she acknowledges that "Lexis's liability for MyLife's publication . . . rises or falls with the aiding-and-abetting and conspiracy theories." Opp. at 19–20. But as explained above, the Complaint does not plausibly allege that Lexis had actual knowledge of MyLife's alleged defamation or substantially assisted it, so Count I fails for these same reasons. *See supra* Part I.A.

Wanna's suggestion that the underlying defamatory statements were "pleaded with the required specificity," Opp. at 20, is also wrong, and independently warrants dismissal of this claim. While Wanna asserts the Complaint identifies the speaker, the statement, the forum, and the recipients of the allegedly defamatory statements, her brief concedes otherwise by recognizing that the "verbatim statements" she challenges, "and the allegations that prospective employers consulted the profile," are "set out in Plaintiff's *prior complaint*"—not this one. Opp. at 21. That is an admission that the operative Complaint is deficient: it neither identifies the "verbatim" statements Wanna challenges, nor does it identify a single prospective employer or other third party who viewed Wanna's profile. Any attempt by Wanna to amend her Complaint to specifically identify these statements would be futile, *see infra* Part II, including because the statements identified in the prior complaint—however specifically described—are still *MyLife's* statements, not

Lexis's, and no amendment, no matter how specific, could make Lexis liable for them. *See infra* Part II.

Wanna's authorities do not point to a different result. She relies principally on *Finlay v. MyLife.com Inc.*, 525 F. Supp. 3d 969 (D. Minn. 2021). Opp. at 20. But as Wanna recognizes, the plaintiff in *Finlay* "identified the statements verbatim"—unlike the Complaint here—and alleged that MyLife made them to his prospective employers. *Id.* The *Finlay* plaintiff also pleaded numerous specific allegations about how MyLife marketed its reputation profiles to prospective employers. *See id.*; Opp. at 21. And, even more fundamentally, *Finlay* involved claims against MyLife, *the actual speaker*, not against a data supplier one step removed from the publication. *Bergh*, too, does not help Wanna. As Wanna acknowledges, the court there held insufficient a plaintiff's allegations about statements to unidentified recipients because the plaintiff "failed to identify 'any prospective employers' at all." Opp. at 20–21 (quoting *Bergh*, slip op. at 9–10). The same is true here.

Finally, Wanna's contentions that MyLife's statements constitute defamation per se and that she suffered actual harm, Opp. at 21–22, are beside the point. Those arguments go to whether *MyLife* defamed Wanna. They do not address whether Lexis may be held liable for MyLife's statements, and Wanna has conceded that question depends entirely on theories she has not plausibly pleaded. Opp. at 19–20.

### 2. Wanna's Consumer Fraud Act Claim Fails Because She Concedes the Alleged Misrepresentations Were MyLife's, Not Lexis's

As Lexis explained in its opening brief, Wanna's MCFA claim should be dismissed because it fails to identify any prohibited conduct Lexis engaged in—let alone any misrepresentation made by Lexis at the time of the sale of data to MyLife. Indeed, while the Complaint alleges Lexis "engaged in deceptive and unlawful trade practices by selling personal data to MyLife," Compl. ¶ 27, the routine sale of data under a licensing agreement plainly does not involve "fraud, . . . false pretense, false promise, misrepresentation, misleading statement or deceptive practice," and merely calling it deceptive does not make it so. *Id.* ¶ 11; *Iqbal*, 556 U.S. at 678. Moreover, the Complaint alleges no false statement by Lexis in connection with this data sale. To the contrary, the misrepresentations Wanna challenges were entirely *MyLife's*, made in connection with MyLife's own business. *See Health Plan, Inc. v. Philip Morris, Inc.*, 68 F. Supp. 2d 1064, 1069 (D. Minn. 1999). Because Lexis made no misrepresentation, the Complaint necessarily fails to allege that Lexis intended anyone to rely on one. It likewise alleges no causal relationship between anything Lexis said or did in selling data to MyLife and Wanna's alleged injury. Finally, MyLife's alleged violations cannot be attributed to Lexis, because Wanna has not plausibly pleaded that Lexis aided and abetted them. *See supra* Part I.A. Yet again, Wanna's attempts to avoid dismissal are unavailing.

First, Wanna again concedes that Lexis cannot be held directly liable for violations of the MCFA because the at-issue "misrepresentations are MyLife's"—not Lexis's. Opp. at 23. While she argues that the MCFA reaches "any person" whose "act, use, or

employment" of a deceptive practice is "in connection with the sale of any merchandise," not just the "party who utters the words," Opp. at 23–24, she nevertheless fails to identify any "act, use, or employment" of fraud, misrepresentation, or deceptive practice by Lexis in connection with its sale of data to MyLife—as the statute expressly requires. Wanna's attempt to distinguish *Kraft* and *Group Health Plan* fails for this reason. Opp. at 23. Both cases require the deceptive statement be made in connection with the defendant's sale. Here, the only alleged misrepresentations were made *by MyLife* in connection with *MyLife's* sale of reports to viewers and removal services to profile subjects. Compl. ¶¶ 12, 21, 27. Wanna's allegation that Lexis sold the data "knowing" it would be misused for this purpose, Opp. at 23 (quoting Compl. ¶ 27), is the same conclusory knowledge allegation that fails as discussed above.

Second, Wanna argues that the MCFA does not require individual reliance and that a causal nexus may run through third parties. Opp. at 24–25. Again, Wanna misses the point. In *Group Health* and *McDougall*, upon which Wanna relies, the causal chain started with the defendant's *own alleged misrepresentations*, which ultimately reached the plaintiff indirectly. Opp. at 25. Here, the chain Wanna describes starts with Lexis's sale of data to MyLife—a transaction Wanna does not allege involved any misrepresentation by Lexis. The only deceptive conduct in the chain—i.e., the publication of the allegedly false profile—is MyLife's. Opp. at 25 (citing Compl. ¶¶ 12–15, 23, 28–29, 34).

### 3. Wanna's Deceptive Trade Practices Act Claim Fails Because She Identifies No Deceptive Practice by Lexis and No Threat of Future Harm

Wanna's other statutory claim—for violation of the Minnesota Deceptive Trade Practices Act ("MDTPA")—should also be dismissed. Because the statute only provides a private cause of action for injunctive relief, a plaintiff must plausibly allege they are likely to suffer future harm from a defendant's prohibited trade practice—all of which concern conduct that misleads or confuses consumers about, among other things, the source, quality, or characteristics of goods and services. The Complaint satisfies neither requirement: it does not explain how Lexis's provision of "personal data to MyLife" is a deceptive trade practice (let alone by reference to any particular subsection of Section 325D.44), nor does it identify any future harm Wanna could allegedly face. To the contrary, the Complaint alleges Wanna has already "suffered damages," Compl. ¶ 30. Nowhere does it claim that Lexis continues to provide data to MyLife to this day, *id.* ¶ 14, nor does it identify any "similar entities" to which Lexis supplies data that could subject Wanna to future harm. *Id.*, Prayer for Relief. And, yet again, to the extent the claim rests on MyLife's publication of "false or misleading profiles" and its solicitation of "payments from consumers," that conduct is attributable only to MyLife, and Wanna has failed to articulate a way to hold Lexis liable for that conduct. *See supra* Part I.A.

Recognizing her failure to identify a statutorily-enumerated prohibited trade practice, Wanna now appears to suggest Lexis's conduct is prohibited by the statute's catch-all in Section 325D.44, subd. 14, which prohibits "any other conduct which similarly creates a likelihood of confusion or misunderstanding." Opp. at 26. This provision does

not help her. By its plain terms, this subdivision reaches only conduct that creates a "similar[]" type of confusion as Section 325D.44's other prohibited practices, which all involve misrepresentations about the source, sponsorship, approval, characteristics, or quality of goods or services. Minn. Stat. § 325D.44, subd. 1. While Wanna implies that "supplying the data that powers" misleading profiles is such conduct, that is clearly incorrect. Supplying data did not cause any confusion or misunderstanding—any likelihood of confusion arose from the profiles MyLife independently chose to publish and the suggestions MyLife chose to make about the profile subjects. To the extent Wanna seeks to attribute MyLife's conduct to Lexis, that effort fails for the reasons in Part I. See *supra* Part I.

Wanna has no good response to her failure to allege future harm, either. First, she points to the allegation that Lexis "continued to supply data and assistance" to MyLife. Opp. at 27 (quoting Compl. ¶ 13). But that allegation describes *past conduct* during the parties' relationship, not an ongoing practice, and the Complaint itself acknowledges MyLife filed for bankruptcy in 2022 (and can therefore no longer engage in the challenged conduct). Compl. ¶ 14. Second, she notes the Prayer for Relief seeks to enjoin sales to MyLife "or similar entities." Opp. at 27. A request for relief is not a factual allegation of threatened harm. The Complaint does not identify any such entity, allege Lexis supplies data to one, or allege Wanna's information appears on any such entity's website. *See* Compl., Prayer for Relief. Finally, Wanna does not address her request for injunctive relief requiring "reasonable data-security and consumer-protection measures," so she has abandoned any argument the Complaint alleges future harm tied to those measures. See

Br. at 18–19. Because the Complaint alleges only retrospective injury the requested injunction cannot redress, the MDTPA claim should be dismissed.

#### 4. Wanna's Civil Conspiracy Claim Fails Because She Pleads No Underlying Tort and No Agreement to Accomplish an Unlawful Purpose

As explained in Lexis's opening brief, Wanna's civil conspiracy claim fails for two, independently sufficient reasons. First, the predicate claims on which it rests, defamation and consumer fraud, fail for the reasons set out above, so there is no "valid underlying tort claim." Compl. ¶ 38; *Bank of Montreal v. Avalon Cap. Grp., Inc.*, 743 F. Supp. 2d 1021, 1033 (D. Minn. 2010). Second, Wanna pleads no facts about the supposed "agree[ment]" between Lexis and MyLife "to a common design to monetize personal data by publishing misleading reputation profiles and soliciting payments from consumers," or about any "concerted actions" taken in furtherance of any such agreement. Compl. ¶¶ 37–38. To the contrary, the only agreement the Complaint plausibly alleges is an arm's-length data-licensing agreement between Lexis and MyLife, which contains safeguards specifically designed to *prevent* improper use of Lexis's data. Compl. ¶ 11.

At the outset, Wanna concedes that a civil conspiracy claim "requires an underlying tort," Opp. at 28, so Wanna's failure to properly plead her claims for defamation and consumer protection violations is fatal here, as well. But even if that were not the case, the claim should be dismissed because Wanna pleads no facts suggesting Lexis and MyLife agreed to engage in an unlawful course of conduct. Wanna's claim that the 2011 Agreement itself is proof of the conspiracy, Opp. at 28–29, conflates a lawful commercial contract with an agreement to accomplish an unlawful purpose. If that were sufficient,

every commercial agreement would satisfy the agreement element of a conspiracy claim whenever one party later misused what it received. Beyond the 2011 contract itself, Wanna offers nothing to support her conclusory allegation that Lexis and MyLife "agreed to a common design to monetise [sic] personal data by publishing misleading reputation profiles and soliciting payments from consumers." Opp. at 29 (quoting Compl. ¶ 37). The supposed "division of labor," in which Lexis supplied data and MyLife published and collected, *id.* (citing Compl. ¶¶ 14, 37), merely describes the parties' respective roles under an ordinary data licensing agreement.

Wanna's attempts to recast the 2011 Agreement's safeguards as evidence of a conspiracy are also unpersuasive. For instance, Wanna argues the provisions requiring lawful use and prohibiting uses that violate the Fair Credit Reporting Act "cut the other way," because "[a] licensor that writes use restrictions into its contract contemplates the misuse they describe." Opp. at 29. But contractually *prohibiting* certain conduct is the *opposite* of agreeing to it. Under Wanna's reasoning, every compliance provision in every commercial contract would become evidence of a conspiracy to commit the very violation it forbids. That interpretation is fatally flawed and unworkable. Her suggestion that "[w]hether Lexis enforced those restrictions" is a question of fact, *id.* at 29, also fails. Failure to police a licensee is the kind of inaction that cannot support secondary liability, *see supra* Part I.A.2, and it certainly does not evidence an *agreement* to an unlawful end.

## II. Wanna's Complaint Should Be Dismissed With Prejudice

Should the Court agree that Wanna has failed to state a claim against Lexis for any of MyLife's misconduct, it should dismiss Wanna's Complaint in its entirety, and with

prejudice. This suit is Wanna's second bite at the apple, filed after her original Complaint—which involved the same parties and materially identical allegations—was dismissed in 2024. *Wanna*, 2024 WL 1345176, at *5. The only difference between the two suits is the theory Wanna uses to try to hold Lexis responsible for MyLife's conduct: having lost on agency, she now pivots to aiding and abetting and civil conspiracy. But the underlying allegations—an arm's-length data license between Lexis and MyLife—have not changed, and no theory of secondary liability can transform those factual allegations into a viable claim against Lexis.

This Court should decline Wanna's request that any dismissal be without prejudice, and with leave to amend. As Wanna concedes, a request for leave raised "only in an opposition brief, without a motion and proposed pleading, does not preserve a right to amend." Opp. at 30 (citing *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 884–85 (8th Cir. 2009); D. Minn. LR 15.1(b)). Leave is also properly denied where amendment would be futile or where the plaintiff has repeatedly failed to cure deficiencies. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Both circumstances are present here. Almost every "additional fact" Wanna proposes to plead—including the volume of public complaints about MyLife, the history of the Lexis–MyLife relationship and the amendments to the 2011 Agreement, and Lexis's alleged sharing in MyLife's revenues—comes from her previously dismissed 2023 complaint. Opp. at 30–31 (citing ECF No. 1-2 ¶¶ 5, 9–10, 35, 39, 47–48, 52–56, 68, 72, 170–171, 176–177). Wanna has had those facts for years and chose not to plead them here. Even if pleaded, they describe nothing more than a long-standing commercial data-licensing relationship. They do not show that Lexis actually

knew MyLife was publishing false statements about Wanna or that Lexis took any affirmative step directed at those statements. *See supra* Part I.A. Indeed, this is Wanna's second lawsuit against Lexis, and her counsel's third action, arising from MyLife's alleged conduct. Opp. at 2–3. Wanna's litigation history shows that, absent a dismissal with prejudice, she will simply return with another concocted theory premised on the same factual allegations, requiring Lexis and the Court to expend still more resources on claims that cannot succeed. Wanna has exhausted her chances to pursue this spurious, baseless suit against Lexis, and the Court should decline to entertain her ongoing efforts. *See* 28 U.S.C. § 1927 (authorizing imposition of sanctions where an attorney "multiplies the proceedings in any case unreasonably and vexatiously"). The Complaint should be dismissed with prejudice.

**CONCLUSION**

For the foregoing reasons, Lexis respectfully requests the Court: (1) grant this Motion to Dismiss; (2) dismiss Plaintiff's Complaint; and (3) grant Lexis any other relief the Court deems appropriate.

Dated: October 30, 2026

By: /s/ Joseph G. Schmitt

Joseph G. Schmitt (Reg. No. 0231447)
NILAN JOHNSON LEWIS
250 Marquette Avenue South, Suite 800
Minneapolis, MN 55401
Telephone: 612-305-7577
FAX: 612-305-7501
jschmitt@nilanjohnson.com

Ronald I. Raether, Jr. (Reg. No. 0272577)
TROUTMAN PEPPER LOCKE LLP
5 Park Plaza, Suite 1400
Irvine, CA 92614-2545
Telephone: 949-622-2700
FAX: 949-622-2739
ron.raether@troutman.com

Joshua D. Davey (admitted *pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
301 S. College St., 34th Floor
Charlotte, NC 28202
(704) 916-1503
joshua.davey@troutman.com

*Attorneys for RELX Group, plc, RELX Inc. d/b/a LexisNexis; LexisNexis Risk Solutions Inc., and LexisNexis Risk Solutions FL Inc.*